Your Honor, as the appellant, in the extremely unusual situation of the district court having granted Jamal to the party with the burden of proof after the conclusion of the evidence but before the case was submitted to the jury. And the way the court did that was filling in the holes that were in the plaintiff's, excuse me, the appellee's, expert's testimony where he never covered the critical claim of the interpolator control module and the requirement that that module rotate the interpolator phase of the sampling signal in the receive lane at a rate corresponding to a frequency offset between the sampling signal and the serial data signal. What BROADCOM admits in their red brief, specifically at page 24, is that they had asked the expert to shorthand his testimony. The shorthand being that he simply then testified that, in his opinion, EMULEX's expert did not disagree with him on certain claims and so he wasn't going to talk about them. Unfortunately, that's – JUSTICE BREYER. Admitted to something like part-time infringement? BROADCOM. That was the argument that was made at the end of the Jamal, that EMULEX had somehow admitted part-time infringement, which is not accurate at all. What EMULEX's expert had admitted or agreed to was that on occasion – and this goes to another part of this limitation – on occasion, there would be a reduction in the frequency offset. On other occasions, there would not. There would be an increase. JUSTICE BREYER. Well, half of the time you would increase in your half-rate architecture, half the time you would be increasing to synchronize, and the other half you'd be reducing to synchronize, right? BROADCOM. Correct. That was – JUSTICE BREYER. Correct. Doesn't that mean half the time you're infringing? BROADCOM. No, Your Honor, because that's only – JUSTICE BREYER. Because the claim says to reduce frequency offset. BROADCOM. That's correct, Your Honor. That's not the part of the claim that we're at issue here. What we are at issue here is the language right before that. If the court looks right above it, what it says is that there is the phase interpolator in each receive lane to rotate the interpolated phase of the sampling signal in the receive lane at a rate corresponding to a frequency offset between the sampling signal and the serial data signal. Let's stop there. That's what we're focusing on now, not the SOAS to reduce. What happened, and the reason that – JUSTICE BREYER. This is the claim construction issue that – BROADCOM. That is how BROADCOM is trying to pose it, is that it's a claim construction issue. It is not, however, a claim construction issue. We are simply reading the claim language verbatim. The claim language requires that this be an at-a-rate correspondence between the frequency offset, which is the difference between the sampling signal and the serial data signal. JUSTICE BREYER. And corresponding to also just mean related to? BROADCOM. Not in this situation, Your Honor. First of all, the Respironix case cited by the appellee says that it means matches or similar to, our experts said, proportional  JUSTICE BREYER. But doesn't the specification trump here? BROADCOM. It would, Your Honor, if it was talking about this claim, but it's not. The related to language is talking about Claim 3, which was not asserted in this case. Claim 3 was dealing with a quarter rate architecture. And when describing Claim 3 in the specification, the language related to was used. JUSTICE BREYER. You mean we're not talking about the same language? BROADCOM. We are not, Your Honor. The Claim 3 is worded very differently than Claim 8. Claim 8 is very specific. It talks about a rate corresponding to a frequency offset between the sampling signal and the serial data signal. Our expert testified, unrebutted, that what that means, if you look in the specification, is sampling signal is represented by omega s, and the serial data signal is represented by omega d. And therefore, the frequency offset, meaning delta omega, is omega s minus omega d. And what he testified to is in the half rate architecture, then the frequency offset does not, there is not the correspondence which is there. And he explained it, I believe, if we look at page 10 of our reply brief, we cite his testimony where he explains it in detail. And I'm going to read it because it gets a bit technical. But what he explained to the jury is in half rate systems, the sampling signal is at half rate of the input data signal. So this rate of rotation has to follow it. D phi, which means simply change in phase, over Dt, which is simply change in time, has to be omega s minus one-half omega d. And went on to say, because the accused product's rate of rotation corresponds to omega s minus one-half omega d, then the rate of rotation, which is like velocity, includes both a direction and a magnitude, does not correspond to the frequency offset. That was the evidence. Now, if I were here arguing in support of a JMOL of non-infringement, perhaps we might have a bigger dispute. But what we're here arguing is that with this unequivocal testimony, it's a factual dispute. Was our expert correct that then the frequency offset does not correspond? The jury should decide that. That was a factual issue, not a claim construction issue. We're not asking for any of these terms to be construed. We're asking them to be taken verbatim. But that depends upon you reading corresponding in a very specific, narrow manner, doesn't it? Actually, I don't think so, Your Honor. I think we read corresponding the same way that Broadcom would ask... You read it the same way the district court does. Yes, Your Honor. It simply means just that, corresponding to. It must have some... Related to. It has to be more than that. It has to be, for the purpose of the thing, it has to be or I'm trying to look at Broadcom's language here. The patent samples four times and you sample two times. Does that difference cause a lack of correspondence? It does, because it changes in the magnitude. We don't have the correspondence of magnitude when one has where you're simply doing the omega S minus omega D. And that's what our expert testified to. That is what the factual testimony was. Whether the jury would have agreed with it or not, we'll never know. Because the court granted Jamal to the party with the burden of proof. Should you then have raised this issue at an earlier point and said the correspondence claim construction requires a different outcome? I don't believe so, Your Honor, because we didn't think there was any dispute. Broadcom argues that... But there apparently is. Well, Broadcom argues in their brief, the corresponding, at page 29 in their brief, the corresponding should mean similar, comparable, or matching. We agree. It should mean similar, comparable, or matching. Or the word that our expert chose was proportional, to which Broadcom never took issue at the trial court. If that's the situation, our expert testified unequivocally and unrebutted that we did not have that proportionality or that matching or that similarity or that comparability. Take whosever words you want, Broadcom's or our expert's. It's just not there, and yet the court granted Jamal of infringement. And that is the major problem here. You are only supposed to do that in the most unusual of cases. And the Noble Pharma case, which is cited by both parties, is a perfect example. There what we had was the plaintiff had introduced an inventor testimony by way of deposition. The defendants had countered, and what they countered was where the inventor had admitted that he had a best mode, that he didn't disclose it in his patent, and that it would have taken undue experimentation to come up with that best mode. Now, going back again to where Judge Lurie was, in column 26, we see that sampling frequency and serial data frequency need to be related to one another, not necessarily equal. And we're not arguing equal, Your Honor. I completely agree, but by the way that... But here, that's the word I've been using, related, and it's used in the patent, and you don't like that word. No, it's not that I don't like that word. That particular part of the specification is actually referring to Claim 3, which has different language than Claim 8. But even if we're talking about related to, which I don't believe is the correct word to be using in relation to Claim 8. Instead, I believe we should use Broadcom's own interpretation, which is similar matching or corresponding. The evidence is, unrebutted, that that doesn't take place in half-rate architecture. Didn't your expert use corresponding in the same sense that Broadcom did when describing the half-rate architecture? No, I don't believe he did, Your Honor. Well, in the same way Broadcom believes, yes. He used it in the same way as in similar, matching, or comparable, certainly. But not as in it just simply has to have some vague relationship. Otherwise, what's the whole purpose of saying in this particular claim that you've got to have a frequency offset between the sampling signal and the serial data signal that is at a rate corresponding to that frequency offset? There would be no point. It could then just have some relationship, no matter how vague. But again, I have to keep going back to the procedural posture of this case. We're not here arguing we should have one summary judge or J-Mall of non-infringement. We're arguing that the court was completely wrong in granting J-Mall of infringement with this kind of factual... Are we trying to limit corresponding to to equal to? Absolutely not, Your Honor. Absolutely not. Definitely not. It sounds to me that way. No, what we are trying to say is that the frequency offset is equal to the difference between the sampling signal and the serial data signal. The at a rate simply needs to correspond to that frequency offset, not equal to, by any means, and we are not arguing that. And we can see where the holes were in the plaintiff's expert's testimony when the court had to resort to saying things like, inherent in his testimony was this. And because he said this, then it must be, it must work, it has to work in this fashion. That means he never said it. Roscom chose to shorthand it, and as a result of that, they didn't meet their burden of proof, and J-Mall was improperly granted. And I'd like to save a little time for rebuttal. Okay. The court has no further questions. Thank you, Ms. Brooks. Thank you. We didn't hear anything about obviousness or injunctions, did we? We did not, Your Honor, but I'll save that for rebuttal, with the court's permission. Mr. Massa. Thank you. Your Honor, may it please the court, my name is Dominic Massa, and together with my partners, Jim Quarles and Louis Tomprose, I represent the Appleby Broadcom Corporation. I'll focus my argument on the infringement question, the only question addressed by Ms. Brooks. If the panel has questions on the injunction or obviousness, I'll address those as well. Your Honor, this does come down to a claim construction issue. As you properly pointed out, Emulet's argument turns on whether the term corresponding to means equal, which it does not, and Emulet says it does not contend now, or whether it includes proportional to. The issue, Your Honor, is well defined in the patent at Column 26, as you referenced. But your opponent says that relates more to Claim 3 than Claim 8. And Emulet's is incorrect, Your Honor. Column 26 says for the frequency to be reduced, it need only be related to one another. And it goes on, and this is at about line 10 through 15. For example, frequencies omega sampling and omega data are considered synchronized to one another when omega data equals n times omega sampling, where n is an integer greater than 1. What that's talking about is when you have n number of samplers. In this system, you can either sample in a full rate architecture, or you can sample in a sub rate architecture. In the instance of the accused products, that's a half rate architecture, so n equals 2. Instead of there being one sampler, there are two samplers, each of which operates at half of the frequency. Therefore, the frequency offset is exactly proportional. That's what it means to be proportional. It's related to one another by this integer n. If I could just put some numbers to it, which our expert did at trial, he talked about a 10 gigahertz sampler, which is 10 billion samples per second. But if we just simplify that, in a full rate architecture, the sampling system could be at 10, and the data could be at 8. The frequency offset would be 2. It would be an offset of 2 that needs to be adjusted for. But in a sub rate system, in a half rate system, that frequency would be reduced by half. So your sampling could be at 5, and your data would also be split among these two lanes and be reduced by half, so your data would be at 4. The frequency offset there is 1. That is exactly proportional to 2. The proportion is one half. Tell us why Pickering doesn't render the claim obvious. Pickering does not render the claim obvious because there is, for several reasons. First of all, Pickering does not suggest the combination with a data path. Pickering is a patent by its very title. It is a clock recovery patent. It is designed to recover a clock signal. That's used to synchronize all of these activities within a chip that are occurring at 10 billion. Well, there's two major differences, the one you're mentioning, the data, and then you'd also have to adjust the phase, so you would be capturing data rather than just the phase. But wouldn't one of skill in the art know to do those things? No, one of ordinary skill in the art would have no reasonable expectation of success. Pickering is designed to match the transition points. If you imagine that sine wave, and we produced that in the brief, imagine that sine wave. It's a crossover point that they're measuring which carries no data because you don't know if it's high or low. Exactly. It carries no data. It carries the clock information. But wouldn't one of skill in the art know that you can just adjust and then you could pick up data as well as sample? But that adjustment is no simple task, and that adjustment is what the 150 patent is directed to. It's not only recovering the clock signal, but once you have that clock signal, determining whether the data point that you're trying to recover occurs a bit too early, a bit too late, and continuously updates the phase in order to capture that data. Pickering is simply not directed towards capturing data. It's a clock recovery system by its very terms, and it's used in circumstances when you need to focus on those transitions, those clock points. If you don't get the data point just right, if you don't sample at the point where your data information occurs, then you'll be in those question mark areas, those unknown areas that we've referred to in our brief. Back to the issue of infringement, Your Honor. It seems that without the claim construction that MUX would require to have corresponding mean equal to, that the half rate system is exactly proportional to a full rate system. There was no genuine disputed issue of fact on this point, and cases like KTAC, which was recently decided, have issued, and this Court has affirmed, summary judgment of infringement where there is no genuine issue of disputed fact. In KTAC, they had an expert, the defendant had an expert, who testified that the structure wasn't met by the claim, just as Dr. Nikolic said at trial, that the structure wasn't met by the claim, but he admitted what the structure was. He admitted that in the MUX system, it's a half rate system where the frequency offset is omega S minus one half omega D. That proportion that MUX admits is covered by the claims. Could Nikolic's testimony at 786 in the record, be interpreted some other way other than as an admission that the accused product practiced the ICM limitation of claiming? Clearly, the Court interpreted it that way. Is there any other reasonable interpretation of it? It seems to me there's your crux on your summary judgment standard. Your Honor, he did admit that the frequency offset was reduced by the structure. At least part of the time. At least part of the time, but that was perhaps a little sloppy language. You're not talking about a method claim here. There is a structure in the apparatus which is used at least part of the time. That structure is always there. Adding another structure which is used the other part of the time, that may not infringe, and that also is an issue of claim construction, but adding to an infringing product does not take you out of the scope of infringement. Their argument at trial was legally insufficient, and that was the basis on which the Court entered JAMAL. Talking a moment about the permanent injunction, does the Apple-Samsung case that this Court recently decided affect at all the district court's grant of a permanent injunction? It does not, Your Honor. There are several distinctions between the Apple-Samsung case and this injunction, and those are, most significantly, this injunction was a well-crafted injunction which included a sunset period. This injunction included a specific period of 18 months for EmuEx to continue infringing the patent so that it could design around and take out the infringing feature. There is no such provision in Apple v. Samsung. That was an immediate and preliminary injunction. That's the other distinction, perhaps not as significant, but that was a balancing of all the eBay factors in a situation where there was a likelihood of infringement. Why would that be an important distinction? I believe it's an important distinction, Your Honor. You say it. Why isn't it important that you've got an adjudicated trespasser and that the remedy for trespass is removal of the trespasser? I think it's certainly important. And the question of whether it's as important as… For Apple-Samsung, you don't have an adjudicated trespasser, right? That's true. And so in balancing the eBay factors, it's a much different balance when you have a proven and adjudicated infringer and also the issue of validity was adjudicated with a finding of non-obviousness. You have both of those facts. Those have to be weighed in the discretion of the court, which did not abuse its discretion when making that weighing. But significantly also, the sunset period allows for a period of time to take that infringing device, to take that feature out of the device and cease infringement. And that goes to the balance of the harms. What about their changed circumstances argument on the injunction? Changed circumstances in what respect, Your Honor? Emulex has represented the court at Broadcom at least since June 12 of this year, licensed the technology encompassed in the 150 patent to Dell, others, HP. First of all, none of those purported licenses are in the record. And if there was an argument for changed circumstances, perhaps Emulex would have made that at the district court level. They didn't. But regardless, there was no license to Dell. There was no license to Cisco. These facts are not in the record, however. There was limited provisions which allowed HP and IBM to continue to sell for a period of time. That's no different from what actually happened in the Broadcom versus Qualcomm case, which this court affirmed an injunction where Broadcom had licensed, in that case, a bear license to Verizon, which was the majority of the market. And this court upheld an injunction and found that that fact alone, where you license a customer, not your competitor. Broadcom has not licensed a competitor to compete against it directly. But Broadcom has worked with some customers in order to do what Broadcom was prevented from in the first place, which is compete fairly for these design wins. And that's another part which goes to the difference between the Apple-Samsung injunction and this circumstance. This is a design-win-based marketplace. Broadcom and Emulex sell to sophisticated OEM manufacturers. They don't sell through retail channels like Apple, Samsung. And in these circumstances, when one design win, and there's testimony in the record, when one design win occurs, there's this stickiness factor. It increases the chances of the next design win occurring. And Emulex competing against Broadcom for those first design wins, while infringing the 150 patents, gets the advantage of that. That is something that without an injunction cannot be repaired, and money damages are not sufficient to remedy that. Thank you. Thank you. Ms. Brooks. Thank you. Very briefly, back to infringement. Even if corresponding to means related to, the record below still cannot support the JMAL. Dr. Stoyanovich, Broadcom's expert, never said the accused products rotate at a rate related to the frequency of the offset. And Broadcom never cited to this court any place where he said that. So whether it means related to or not, the record is still devoid of evidence that would allow JMAL. Dr. Nikolic never admitted that the accused products rotate at a rate related to the frequency offset. So again, the record is not appropriate. It's all about the record and what the jury should or should not have been allowed to deal with. Your Honor asked an interesting question about could Dr. Nikolic's testimony be interpreted in a different way, in more than one way, and the answer is yes. That's for the jury to determine, not for the court to substitute the court's judgment as to what Dr. Nikolic did or did not mean, since the testimony speaks for itself. Going now to the obviousness very quickly. The Pickering reference has everything but the data path. And Your Honor's asked whether or not it would have been obvious to one of skill in the art to simply make that jump, and the response was, well, such an adjustment is not an easy thing to do. Well, the definition of one of skill in the art here includes several years of post-graduate experience with cloth data recovery systems. To someone of that skill in the art, it is indeed a very easy thing to do. Of course, there are secondary considerations that were found here. There were secondary considerations. Pickering was before the patent office. And Pickering was before the patent office, indeed. But we all know, obviously, the standard doesn't change. It's still clear and convincing. While it may be a little more difficult to get over that hurdle, this is very complex technology with a very high level of skill in the art that one has to have to truly understand it, and we know that examiners make mistakes and references get overlooked. In this particular case, we had a reference that was essentially spot on minus the data path, and their expert agreed that in order to demodulate, you're going to need a data path. But where in the record is there evidence that one of skill in the art would easily be able to adjust the phase to capture data? That's from Dr. Nicholas, Your Honor. I can get the course of citation, and my co-counsel will hopefully find it quickly in our reply brief. But what the testimony was is that in the nature of the problem to be solved, which is a high-speed transceiver device, you would necessarily need both a data path and a clock recovery mechanism. And Dr. Stajanovich agreed that that data path is not a difficult thing to find. The difficult thing, as Dr. Lee, the inventor, talked about was the algorithm, which is part of an in-Pickering. Reading the patent, though, if you get off a little bit, it affects the reading. There seems to be a bigger problem here than you're characterizing. And I didn't find any place where Dr. Nicolich said, well, a person of skill in the art could do this with his eyes closed. Well, he didn't exactly say with his eyes closed, but he did say that the data path part is the most obvious part and the easiest part. And Dr. Lee, the inventor on the 150 patent, admitted that it wasn't the data path part that was the difficult part. The difficult part was the algorithm, which is already in Pickering. So the difficult part was in both references. And the question is, would one of skill in the art, who had several years of postgraduate experience with clock data recovery circuits, would it have been obvious to solve the very problem that Pickering was trying to solve? No, no, Pickering's solving a clock phase problem, not a data capture problem at all. Well, but one doesn't... And it says so. It doesn't address data. So why would one of skill in the art even consult Pickering for data capture? Because it actually does address the CDRs, which are clock data recovery circuits. That's what Pickering was aimed at. And inherent within that is you're going to be talking about recovering data. There's no purpose to just recovering the clock.  It does address CDRs, Your Honor. And you're right, what's missing is the actual... Thank you, Mr. Barkin. So the Pickering reference states, it is very important to recover a corresponding clock signal in order to demodulate... I'm looking for where in the record it says that a person of skill in the art would easily make the adjustment up and down the wave to make sure you're capturing data. Remember, if you get a little bit off, you're not going to get the right reading. Understood, Your Honor. And I would cite the court to pages 37 and 38 of our opening brief, where this is discussed in both the terms of the testimony of Dr. Stajanovich and the testimony of Dr. Nicolich, where they both... What does Dr. Nicolich say? Dr. Nicolich testified that there is simply, quote, no purpose to the Pickering circuit except to sample data, precisely as the patent claims in the 150. And then there is showing figure 16 of Pickering, which specifically talks about clock... Okay, now we've got the data capture at least addressed. The problem is adjusting the phase to measure that data accurately, recognizing that if you don't hit the proper places on that wave, you're going to get false data. So where is that easy? Where is it explained that that's easy? Yes. I can't point, Your Honor, to a specific record. I couldn't find it in the record either. Doesn't that kill you? I don't think so at all, Your Honor, because what? We have the inverse. We have the inventor testifying about what's the difficult part of it, and it's the difficult part with the algorithm. Therefore, the rest just follows that that's the non-difficult part, or i.e., the easy part. And that's the record we have before the court. I don't know if I think I'm out of time. Thank you, Ms. Brooks. Any final thought or are you... Only about the injunction, Your Honor, that hopefully it will be a moot point if Your Honor finds JMAL was improperly granted and we are remanded to the district court. We do have a trial schedule for remaining patents in April that we could simply add this patent and try to get it to the jury as it should have been done originally. Thank you very much. Thank you very much. All rise.